Brent O. Hatch (5715)
hatch@hatchpc.com
Adam M. Pace (14278)
pace@hatchpc.com
**HATCH LAW GROUP, PC**
22 East 100 South, Suite 400
Salt Lake City, Utah 84111
Telephone: (801) 869-1919

MaryBeth V. Gibson (Pro Hac Vice to be Filed)
marybeth@gibsonconsumerlawgroup.com
**GIBSON CONSUMER LAW GROUP, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA 30342
Telephone: (678) 642-2503

*Counsel for Plaintiff and the Proposed Class*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

---

| | |
|---|---|
| REMI ZELLERS, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>INSTRUCTURE, INC.,<br>Defendant, | **CLASS ACTION COMPLAINT**<br>JURY TRIAL DEMANDED<br>Case No. 2:26-cv-000467<br>Judge _______________ |

Plaintiff Remi Zellers ("Plaintiff"), by and through her undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendant Instructure, Inc. ("Instructure" or "Defendant"). Plaintiff alleges the following based on personal knowledge, information and belief, and the investigation of counsel.

## I. NATURE OF THE ACTION

1. Plaintiff and the proposed Class Members bring this class action lawsuit on behalf of all persons who entrusted Defendant with sensitive Personally Identifiable Information ("PII" or "Private Information")[1] that was impacted in a data breach (the "Data Breach" or the "Breach").

2. Defendant is a web-based learning management system that provides services for schools.[2] It is used by learning institutions, educators, and students to access and manage online course learning materials and communicate about skill development and learning achievement.[3]

3. Defendant operates the learning management system ("LMS") Canvas. Canvas offers "powerful tools for course creation, grading, collaboration, and mobile learning."[4]

4. Tens of millions of individuals have used Canvas, and "[a]t peak, Canvas has supported 6 million concurrent users.[5]

5. Canvas processes the following types of data: personal data, institution data, user-generated content, and system data.[6]

6. Plaintiff's claims arise from Defendant's failure to properly secure and safeguard Private Information that was entrusted to it, and its accompanying responsibility to store and transfer that information.

---

[1] *See* 2 C.F.R. § 200.79 (defining personally identifiable information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information.)

[2] https://community.instructure.com/en/kb/articles/662716-what-is-canvas.

[3] *Id.*

[4] *Exploring Canvas*, INSTRUCTURE, https://www.instructure.com/resources/videos/exploring-canvas.

[5] *With Canvas, smart tech is just the beginning*, INSTRUCTURE, https://www.instructure.com/canvas.

[6] *Institutions & Educators Privacy | FAQ*, INSTRUCTURE, https://www.instructure.com/privacy-security/institutions-educators-faq.

7. Instructure represents that "[s]ecurity, equity, and compliance matter—and our tools and teams help you manage them with ease."[7]

8. Instructure's Students & Parents Privacy FAQS state:

> Instructure only uses your information to provide our Canvas service to you and your school. We do not sell your information to other companies. We do not use your information to advertise to you. **We do not share your information with companies or people that do not have explicit and known permission to see or access your information.** Your user information is accessible to your school, teachers, and administrators. Your submitted content information (for example: assignments, projects, discussion group content) is accessible only by your teachers and approved institutional administrators. Your scores and grades are accessible by your teachers and approved school officials.[8]

9. Defendant owes Plaintiff and Class Members an affirmative duty to adequately protect and safeguard this PII against theft and misuse. Despite such duties created by statute, regulation, and common law, at all relevant times, Defendant utilized deficient data security practices, thereby allowing sensitive and private data to fall into the hands of strangers.

10. On April 29, 2026, Instructure first detected unauthorized access to its systems.[9]

11. On April 30, 2026, Instructure "announced that it was experiencing a service disruption" and on May 1, 2026, Instructure confirmed that cybercriminals were behind the attack.[10]

---

[7] Instructure, s*upra* note 6.
[8] *Students & Parents Privacy / FAQ*, INSTRUCTURE, https://www.instructure.com/privacy-security/students-parents-faq. (emphasis added).
[9] Matt Binder, *Instructure data breach: ShinyHunters says it stole data and private messages from 275 million teachers and students*, MASHABLE (MAY 4, 2026), https://www.mashable.com/article/instructure-canvas-edtech-data-breach-shinyhunters.
[10] *Id. See also* Ionut Arghire, *Edtech Firm Instructure Discloses Data Breach Amid Hacker Leak Threats*, SECURITYWEEK (MAY 4, 2026), https://www.securityweek.com/edtech-firm-instructure-discloses-data-breach/.

12. On May 3, 2026, the cybercriminal group ShinyHunters uploaded 3.65 terabytes of data, and shared a ransom note, claiming to have exfiltrated 275 million individuals' data and billions of private messages.[11]

13. On May 7, 2026, ShinyHunters uploaded with a ransom demand on Canvas login pages, preventing students and instructors from accessing the platform, and causing delays relating to assignment deadlines, grading, and exams.[12]

14. On May 12, 2026, Instructure announced that it paid the ransom, and in exchange, Instructure received its data back from ShinyHunters, as well as digital confirmation that the exfiltrated data was destroyed, and assurance that Instructure customers will not be extorted.[13]

15. In reality, there is no way to confirm that the Threat Actor ShinyHunters did not keep copies and will not use the data for malfeasance. Indeed, Cliff Steinhauer, director of information security and engagement at the National Cybersecurity Alliance, commented: "there is no reliable way to verify those claims, and history shows that data is often retained, resold, or used in future extortion attempts."[14]

16. But for Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect PII, the Data Breach would not have occurred.

17. Despite Defendant's awareness of both the value and sensitivity of the data it safeguarded and serious risk presented by insufficient security practices, Defendant did not take

---

[11] Arghire, *supra* note 10.

[12] Ionut Ilascu, *Instructure confirms hackers used Canvas flaw to deface portals*, THE BLEEPING COMPUTER (MAY 11, 2026), https://www.bleepingcomputer.com/news/security/instructure-confirms-hackers-used-canvas-flaw-to-deface-portals/.

[13] *Security Incident Update & FAQs*, INSTRUCTURE, https://www.instructure.com/incident_update.

[14] Kathryn Palmer, *Instructure Pays Ransom to Canvas Hackers*, INSIDE HIGHER ED. (MAY 11, 2026), https://www.insidehighered.com/news/tech-innovation/administrative-tech/2026/05/11/instructure-pays-ransom-canvas-hackers.

sufficient steps to ensure that its systems were secure. Defendant knew or should have known about the risk to the data it stored and processed, and the critical importance of adequate security measures in the face of increasing threats.

18. Defendant owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information it collected safe and secure from unauthorized access. Defendant solicited, collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

19. The Data Breach was directly and proximately caused by Defendant's failure to implement reasonable and industry-standard data security practices necessary to protect its systems from a foreseeable and preventable cyberattack.

20. Through this wrongful conduct, the sensitive PII of Plaintiff and Class Members is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiff and Class Members suffered harm the moment their PII was accessed and exfiltrated without their authorization.

21. The sensitive nature of the data exposed through the Data Breach signifies that Plaintiff and Class Members have suffered irreparable harm. Plaintiff and Class Members have lost the ability to control their Private Information and are subject to an increased risk of identity theft.

22. Defendant failed to use reasonable security procedures and practice appropriate to the nature of the sensitive, unencrypted information it maintained for Plaintiff and Class Members, causing the exposure of Plaintiff's and Class Members' Private Information.

23. Taking reasonable, standard precautions against cybercrime and data breaches is a fundamental part of doing business in the modern age. By collecting and maintaining Plaintiff and

the Class Members' Sensitive Private Information, Defendant was required by law to exercise reasonable care and comply with industry and statutory requirements to protect that information.

24. Despite this promise and its legal obligations to safeguard the Private Information entrusted to it, Defendant implemented inadequate data security measures and allowed the information of 275 million individuals to be stolen by cybercriminals.

25. The Data Breach was a direct, foreseeable, and the result of Defendant's deficient cybersecurity practices. The wealth of publicly available information and industry warnings regarding cyberattacks makes Defendant's failures all the more egregious. Defendant disregarded the rights of Plaintiff and Class Members by failing to implement proper and reasonable measures to safeguard the Private Information in its custody, and by failing to take the available and necessary steps to prevent the unauthorized disclosure of that information.

26. While Defendant's breach of its duties led to the Data Breach, it is Plaintiff and other victims of the Data Breach that will bear the burden for years to come. The exponential cost to Plaintiff and the Class Members resulting from the Data Breach cannot be overstated. By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can use victims' names, birth dates, social security numbers, and addresses to open new financial accounts, rack up fraudulent charges, obtain government benefits and IDs, fabricate identities, and file fraudulent tax returns, well before the person whose Private Information was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim—causing years of damage to their credit scores, financial stability, and personal security.

27. Plaintiff and Class Members have been harmed because they are at immediate risk of having their personal information used against them. They suffered harm in the loss of the value of their data which cannot be recovered.

28. Through this lawsuit, Plaintiff seeks to hold Defendant responsible for the injuries it inflicted on Plaintiff and millions of similarly situated individuals due to its impermissibly inadequate data security measures, and to obtain injunctive relief requiring, among other things, the implementation of security measures sufficient to protect the Sensitive Private Information that remains in Defendant's custody and control. Such injuries include: (i) lost value of Private Information, a form of property that Defendant obtained from Plaintiff and Class Members; (ii) out-of-pocket expenses associated with preventing, detecting, and remediating identity theft, social engineering, and other unauthorized use of their Sensitive Private Information; (iii) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) the continued, long term, and certain risk that unauthorized persons will access and abuse Plaintiff and Class Members' Sensitive Private Information; (v) the continued and certain increased risk that the Private Information that remains in Defendant's possession is subject to further unauthorized disclosure for so long as Defendant fails to undertake proper measures to protect it; (vi) theft of their Private Information and the resulting loss of privacy rights in that information; (vii) immediate injury due to the loss of privacy the moment her Sensitive Private Information was viewed, accessed, and exfiltrated without her consent or authorization (viii) credit freezes and unfreezes; (ix) decreased credit scores; (x) lost work time; and (xi) anxiety, annoyance, and nuisance.

29. Accordingly, Plaintiff brings this action on behalf of herself and the proposed Class for, among other things, negligence and negligence per se.

## II. PARTIES

30. Plaintiff Remi Zellers is an adult natural person, whose Private Information was collected, stored, and maintained by Defendant. Plaintiff Zellers is a citizen and resident of Ohio.

31. Defendant Instructure, Inc. is a Delaware corporation with its headquarters and principal place of business located at 6330 South 3000 East, Suite 700, Salt Lake City, UT 84720.

## III. JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

33. Defendant is subject to personal jurisdiction in Utah because it maintains its principal place of business here, conducts substantial business here, and the acts and omissions giving rise to Plaintiff's claims occurred, in substantial part, in this District.

34. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant resides in this District, maintains its principal place of business in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District, including the failure to implement reasonable data security measures; the operation and oversight of the systems compromised in the Data Breach; and Defendant's decisions regarding breach detection, investigation, and notification.

## IV. FACTUAL BACKGROUND

### A. Defendant Affirmatively Collected, Stored, and Retained Plaintiff's and

**Class Members' Private Information.**

35. Defendant is a Utah-based learning management system that provides services to thousands of schools and millions of students across the country.

36. Defendant is an educational technology developer and publisher that provides Canvas LMS, a platform used by thousands of schools across the United States to manage online learning materials, facilitate communications between students and teachers, view assignments and grades, and submit quizzes, tests, and assignments.

37. Defendant and its client schools require users of Canvas LMS, including Plaintiff and Class Members, to provide Private Information as a condition of using the platform.

38. Plaintiff and Class Members directly or indirectly provided their Private Information to Defendant in connection with the services Defendant provides.

39. Defendant made promises and representations to individuals, including Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained, including through its privacy policy.[15]

40. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

41. As a result of collecting and storing the Private Information of Plaintiff and Class Members, Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and Class Members' Private Information from disclosure to third parties.

---

[15] *See Product Privacy Notice*, Instructure, accessible at https://www.instructure.com/policies/product-privacy-policy (last visited May 4, 2026) (Hereinafter referred to as the "Privacy Policy").

42. By collecting and storing Plaintiff's and Class Members' Private Information, Defendant assumed equitable and legal duties to implement adequate data security measures to protect and safeguard Plaintiff's and Class Members' information from unauthorized access and disclosure. Defendant was the only entity capable of securing the data in its possession against a foreseeable data breach, and Plaintiff and the Class were entirely reliant on Defendant to protect their Sensitive Private Information.

43. Defendant, however, breached these duties by implementing inadequate data security measures, creating a foreseeable risk of harm to Plaintiff and the Class that materialized during the Data Breach, and further resulting in the access and exfiltration of Plaintiff's and Class Members' Private Information by cybercriminals.

**B. Defendant Knew the Risks of Collecting and Storing Sensitive Private Information.**

44. At all relevant times, Defendant knew it was collecting and storing individuals' Private Information, and that as a result, its systems would be attractive targets for cybercriminals.

45. Private Information has significant value on the criminal black market, including on the Dark Web, particularly in data sets containing all of the necessary building blocks to commit a variety of fraudulent schemes and identity theft. And once exposed, this information cannot be made private again.

46. Numerous sources cite dark web pricing for stolen identity credentials. For example, a single victim's personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[16] Unfortunately, law enforcement has difficulty

[16] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs; *see also*, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*

policing dark web activity due to encryption that permits sellers and purchasers to conceal their identity.

47. While the disclosure of compilations of Private Information are undoubtedly harmful, even the disclosure and misuse of discrete pieces of information—especially unique government identification numbers like Social Security, passport and driver's license numbers that cannot be easily replaced—can cause significant harm. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the impacted victim, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

48. For example, the Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for an identity theft victim:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[17]

---

https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[17] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

49. Because government identification numbers like Social Security numbers cannot be easily or quickly changed, victims of identity theft from data breaches often face multiple incidents of fraud over their lifetime due to the reuses of stolen data, and "may not find out that someone is using [their] [Social Security number] until [they]'re turned down for credit, or [they] begin to get calls from unknown creditors demanding payment for items [they] never bought,"[18] which highlights the long-term harms caused by the breach of such sensitive data.

50. Government agencies thus consider Social Security Numbers to be so sensitive as to warrant special considerations to ensure their security, regardless of whether they are maintained as "stand-alone [data] [or] when associated with any other identifiable information[.]"[19] The Government likewise recognizes that even partial Social Security numbers must be protected, because loss of "[t]he full or partial SSN can increase the risk of identity theft or fraud (i.e., access to bank accounts, driving records, tax and employment histories, and other private information[.]" To minimize the increase in risk of identity theft or fraud, the National Institutes of Health recommends the following measures:

a. Collect SSN as a primary identifier only if permitted by law;

b. Reduce and/or eliminate the use of SSNs not required for a business purpose;

c. Use an alternate identifier (unique, randomly generated number not derived from Sensitive Private Information);

---

[18] *Identity Theft and Your Social Security Number*, Social Security Administration (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[19] *See, e.g.*, *Frequently Asked Questions (FAQ)*, U.S. Dep't of Commerce, Office of Privacy and Open Government, https://www.commerce.gov/opog/frequently-asked-questions-faq.

d. Transmit SSN electronically only through an encrypted means. [20]

51. Even if cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of stolen information to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

52. The development of "Fullz" packages means stolen information from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers is not included in the Sensitive Private Information stolen in a specific incident, criminals can easily create a "Fullz" package that links that information together and sell the package at a higher price.

53. Importantly, once a cybercriminal has a "Fullz" package, cybercriminals can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[21] Most problematic, however, is that cybercriminals in possession of a "Fullz" package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[22]

---

[20] *The Privacy Pulse*, U.S. Nat'l Inst. Health (June 21, 2013), https://oma.od.nih.gov/forms/Privacy%20Documents/Privacy%20Newsletters/2013/Privacy%20Pulse%20-%20June%202013%20SSN.pdf; *see also*, https://www.dhs.gov/sites/default/files/publications/dhs%20policy%20directive%20047-01-007%20handbook%20for%20safeguarding%20sensitive%20PII%2012-4-2017.pdf.

[21] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DataDome (Mar. 3, 2023), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work.

[22] *Protection Against Fullz and Fraud, Integrity*, Aristotle (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

54. Just like "Fullz" dossiers of PII are desirable to cybercriminals, stolen PII is also highly valuable because they enable cybercriminals to conduct targeted "phishing" or "spearphishing" attacks.

55. Phishing attacks are fraudulent communications—typically emails, text messages, or phone calls—designed to deceive recipients into revealing Private Information such as login information, financial account numbers, or other highly Private Information. These attacks often impersonate trusted institutions, including banks, government agencies, and current and former employers, and have become increasingly sophisticated in their ability to appear legitimate.[23]

56. Spear phishing is a targeted and particularly dangerous variant of phishing in which attackers use personal information about a victim—such as their name, address, employment information, Social Security number, government identification numbers, or other details—to craft highly personalized and convincing fraudulent messages. Unlike generic phishing attacks sent to mass audiences, spearphishing messages are tailored to the specific individual, dramatically increasing the likelihood that the recipient will be deceived.[24]

57. Plaintiff and the Class Members are subject to even greater risks of spear phishing because private messages exchanged within the Canvas platform were viewed, accessed and exfiltrated by the cybercriminals. Armed with personal information in private messages about Class Members, cybercriminals can craft convincing fraudulent messages placing Plaintiff and Class Members at even higher risk of fraudulent activity.

58. Cybersecurity researchers and law enforcement agencies, including the FBI and the Cybersecurity and Infrastructure Security Agency (CISA), have repeatedly documented the

---

[23] *Spoofing and Phishing*, FBI, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/spoofing-and-phishing (last visited Feb. 17, 2026).
[24] *Spear Phishing vs. Phishing: What's the Difference?*, Analyst1 (Oct. 12, 2023), https://analyst1.com/spear-phishing-vs-phishing/.

connection between data breaches and subsequent phishing campaigns targeting affected individuals. For example, in the aftermath of the National Public Data breach in 2024, Microsoft warned consumers that the data breach created a "high likelihood" of phishing attacks using the information stolen in that breach.[25]

59. Aside from these risks of identity theft, fraud, and phishing or spearphishing attacks, PII is also property that has monetary value to data breach victims.

60. While the economic value of individual data was leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use, market exchanges have sprung up where individual users like Plaintiff can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay users for their data.[26] Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[27]

61. There are numerous examples of this kind of market, which is growing more robust as information asymmetries are diminished when users discover how their data is being covertly intercepted, collected, used, and disclosed.

62. According to an essay published by the Centre for International Governance Innovation:

> The social and economic importance of personal data is well understood. Personal data — typically defined as "information about an identifiable individual" — is central to a person's identity and can reveal intimate details about them. For businesses and governments that collect personal data, this information is often necessary to provide goods or services to specific individuals.

---

[25] *National Public Data breach: What you need to know*, Microsoft, https://support.microsoft.com/en-us/topic/national-public-data-breach-what-you-need-to-know-843686f7-06e2-4e91-8a3f-ae30b7213535.

[26] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[27] Jacob Kastrenakes, *A new TikTok Clone hit the top of the App Store by paying users to watch videos*, The Verge (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktokclone-pay-watch-videos-kuaishou-bytedance-rival.

> However, personal data can also be used in the design and creation of goods or services. For example, such data can be used to create profiles or to drive targeted advertisements. Personal data is used in massive quantities to train artificial intelligence (AI) systems; it is also important to a variety of research activities.[28]

63. In other words, a successful cyberattack leaves criminals with a lucrative and readily monetized supply of Private Information—and deprives its victims of the exclusive use of their own information.

64. The value of this information has led to a marked increase in the number of data breaches in the United States.

65. In light of recent high-profile data breaches at industry-leading companies, including, e.g., Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

66. Defendant knew or should have known that the Private Information it collected and retained was highly sensitive and of significant value to cybercriminals, as this information is routinely bought, sold, and exploited on criminal marketplaces, including on the Dark Web, where it can be used to commit identity theft, financial fraud, tax fraud, and other crimes.

67. Likewise, the documented increase in cyberattacks, combined with increasing monetary incentives that heighten the risk of future attacks, was widely known to the public and to anyone in Defendant' industry, including Defendant, at the time of the Data Breach.

---

[28] Teresa Scassa, *Different Perspectives on Notions of Value The shifting Value of Personal Data* (Nov. 12, 2024), https://www.cigionline.org/articles/the-shifting-value-of-personal-data/.

68. Defendant was therefore on notice of the risk of cyberattack and misuse of data in its custody well before the Data Breach. Highly publicized data breaches involving similarly situated entities demonstrate that centralized repositories containing Private Information are prime targets for cybercriminals seeking to exfiltrate and monetize this data.

69. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and secure, to use their information for business purposes only, to delete their information when it was no longer reasonably necessary to retain, and to make only authorized disclosures of their information.

70. By obtaining, collecting, and storing Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Private Information from foreseeable risks of disclosure to unauthorized parties. Defendant agreed to and undertook legal duties to securely store and maintain the e Private Information of Plaintiff and Class Members.

71. Indeed, as demonstrated by the foregoing, Defendant's collection, storage, and retention of Private Information created a foreseeable and substantial risk of precisely the type of harm suffered by Plaintiff and Class Members, including loss of control over their personal information, increased risk of identity theft and fraud, actual misuse of their PII and PHI, and the need for ongoing mitigation measures.

### C. Defendant Failed to Protect that Sensitive Private Information, resulting in the Data Breach.

72. The ransom group, ShinyHunters, claims that it gained access Defendant's network and acquired "275 million individuals data ranging from students, teachers, and other staff containing PII."[29]

73. Defendant has yet to formally notify impacted individuals about the Data Breach.

74. Defendant has not provided details about the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, Defendant has not explained or disclosed these facts to Plaintiff and Class Members.

75. Unauthorized actors gained access to Defendant's computer systems and acquired files containing sensitive Private Information. The incident resulted from Defendant's failure to adequately secure its networks, systems, and data against foreseeable cyber threats. As a result of the intrusion, cybercriminals were able to access and exfiltrate Private Information belonging to affected individuals.

76. The information compromised in the breach includes broad swaths of information Defendant collected from Plaintiff and Class Members. Such Private Information is highly valuable to identity thieves and can be used to commit fraud, identity theft, and other forms of misuse. Individuals whose information was exposed therefore face an ongoing and heightened risk of identity theft, financial fraud, and other harms resulting from the breach.

**D. The Data Breach and the resulting harm was entirely foreseeable and Defendant failed to protect against it or to minimize its impact.**

77. The risk of a data breach was well known and foreseeable to Defendant. As set forth *supra*, Private Information of the type Defendant maintained is a prime target for cybercriminals,

---

[29] https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/.

and ransomware attacks against similar-type entities were widespread and escalating well before the intrusion.

78. Despite this known risk, Defendant failed to implement reasonable cybersecurity safeguards appropriate to the nature and scope of the data it collected and retained.

79. Cybersecurity firms and federal agencies have promulgated a series of best practices that should be implemented by companies that handle or facilitate the handling of personal information like that Defendant collected and kept, including, at minimum: establishing secure password and authentication procedures for employees; building secure networks by setting up network protection tools like firewalls and constantly monitoring for and patching vulnerabilities; monitoring active and inactive IP addresses, whitelisting software, and monitoring suspicious traffic on their networks; encrypting sensitive data using robust encryption algorithms; limiting access to data to only relevant staff; and properly training staff regarding password hygiene, phishing attacks, and social engineering attacks.[30]

80. The FTC has issued numerous guides for business outlining reasonable data and cyber security practices to diminish data breaches and the resulting harm to consumers and financial institutions, which it believes should be factored into all business decision-making.[31]

81. The FTC's 2016 publication *Protecting Personal Information: A Guide for Business*—which the agency re-endorsed in October 2023—established guidelines for

---

[30] *Customer Data Security: Best Practices for Data Privacy*, CDP, https://cdp.com/articles/customer-data-security-best-practices/; NIST, *Special Publication 800-122: Guide to Protecting the Confidentiality of Personally Identifiable Information*, https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf.

[31] *Start with Security: A Guide for Business* at 2, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

fundamental data and cyber security principles and practices for business.[32] The guidelines note businesses should, among other best practices:

a. Protect the personal customer and consumer information that they keep;

b. Properly dispose of personal information that is no longer needed;

c. Encrypt information stored on computer networks;

d. Understand their network's vulnerabilities; and

e. Implement policies to correct security problems.[33]

82. The guidelines further recommend that businesses implement an array of specific methods to protect their systems, such as:

a. Using an intrusion detection system to expose a breach as soon as it occurs;

b. Monitoring all incoming traffic for activity indicating someone is attempting to hack the system;

c. Watching for large amounts of data being transmitted from the system; and

d. Having a response plan ready in the event of a breach.[34]

83. For example, Defendant is prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' Sensitive Private Information is an "unfair practice" in violation of the FTC Act.

---

[32] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business. *See also Start with Security: A Guide for Business*, FTC (October 2023) (reiterating the principles underlying *Protecting Personal Information: A Guide for Business* and acknowledging "[t]hreats to data may transform over time, but the fundamentals of sound security remain constant.)

[33] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business.

[34] *Id.*

84. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer and consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. While Defendant is prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce," Defendant nonetheless failed to implement reasonable and appropriate security measures to protect against unauthorized access to individuals' confidential Private Information.

85. Further, the National Institute of Standards in Technology ("NIST") publishes specific recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[35] Defendant failed to adhere to NIST guidance.

86. For example, NIST recommends that, to prevent security breaches through phishing attacks, companies should: require employees to practice regular exercises in no-notice social engineering attempts to collect information and gain unauthorized access to company systems; educate employees on the adverse impact of opening malicious email attachments; provide literacy training on recognizing and reporting potential and actual instances of social engineering and social mining; and monitor emerging vulnerabilities (like new social engineering techniques) and implement procedures to mitigate the risks of those vulnerabilities.[36]

---

[35] *Security and Privacy Controls for Information Systems and Organizations*, https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf (last visited Feb. 13, 2026).

[36] *Id.* at 60-61.

87. NIST further recommends that, to limit the impact of a data breach, organizations must dispose of information in its custody or control once it is no longer needed.[37]

88. Upon information and belief, Defendant implemented inadequate security measures and failed to comply with industry standards to prevent social engineering and ransomware attacks, specifically by:

a. failing to adequately train employees on phishing attacks, social engineering attacks, and ransomware attacks;

b. failing to conduct simulated phishing campaigns to test readiness;

c. failing to implement procedures to mitigate the risk of social engineering and ransomware attacks;

d. failing to implement advanced email security platforms with phishing detection;

e. failing to conduct real-time URL and attachment scanning;

f. failing to implement Zero Trust network architecture;

g. failing to adequately monitor its systems for suspicious activity;

h. failing to adequately encrypt or otherwise secure Private Information in its custody;

i. failing to detect unauthorized access in a timely manner; and

j. failing to promptly contain the intrusion once it occurred.

89. Reasonable data security measures—such as network segmentation, access controls, employee training, encryption of sensitive data, intrusion-detection systems, advanced email security platforms with phishing detection, and regular vulnerability testing—were

[37] *Id.* at 352.

available, widely adopted in Defendant's industry, and necessary to protect the Private Information entrusted to Defendant.

90. Defendant failed to implement or properly maintain these reasonable measures, despite representing that it would safeguard individuals' Private Information and despite its obligations under applicable laws, regulations, and industry standards.

91. As a direct and proximate result of Defendant's data security failures, unauthorized actors were able to access Defendant's systems, exfiltrate Private Information, and can publish that information on the Dark Web, causing the injuries alleged herein.

**E. The Data Breach Put Plaintiff and Class Members at Imminent Risk of Fraud, Identity Theft, and other Cybercrimes.**

92. Defendant's failure to keep Plaintiff's and Class Members' Private Information secure has severe ramifications.

93. Given the nature of the Private Information stolen in the Data Breach, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future.

94. Criminal law also recognizes the value of Private Information by imposing harsh prison sentences for those who steal this data. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Sensitive Private Information by: (1) demanding a ransom or blackmail payment for its destruction, (2) using Sensitive Private Information to commit fraud or identity theft, or (3) selling Sensitive Private Information to other cybercriminals on the black market and on the Dark Web.

95. Once cybercriminals start committing fraud and other identity theft-related crimes using a victim's Private Information, the disruption to the victim's life can be catastrophic. A study by the Identity Theft Resource Center ("ITRC") found that, among individuals who experienced

fraudulent use of their Sensitive Private Information, nearly all of them had experienced some form of costs or other harm in their lives, including having to borrow money, being forced out of their home or residence, and being unable to care for their family.[38]

96. Further, although the theft of Private Information creates an imminent risk of becoming a victim of identity theft and fraud, malicious actors often wait months or years to use the PII obtained in data breaches. GAO determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[39] During this delay, victims often become complacent and less diligent in monitoring their accounts after a significant period has passed.

97. Cybercriminals will also re-use stolen Private Information, meaning individuals can be the victim of several cybercrimes stemming from a single data breach.

98. Beyond all of the injuries described, events like the Data Breach also have a deep psychological impact on their victims:

> In some ways, a cyber attack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread. Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyber attack. While expected, these emotions can paralyze you […].[40]

---

[38] Identity Theft Resource Center, *Identity Theft Resource Center 2025 Consumer Impact* Report (October 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/10/The-2025-ITRC-Consumer-Impact-Report.pdf at 16.

[39] U.S. Gov't Accountability Off., GAO-07-737, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 42 (June 2007), available at https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm.

[40] Amber Steel, *The Psychological Impact of Cyber Attacks*, LastPass (Aug. 17, 2022), https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks.

## V. PLAINTIFF'S EXPERIENCES

99. Defendant acquired and maintained Plaintiff's Private Information as part of its standard business practices and in connection with her school, Morgan State University.

100. Plaintiff provided Defendant with her most sensitive personal information.

101. Plaintiff's Private Information was accessed and exfiltrated in the Data Breach.

102. Plaintiff Zellers regularly takes steps to safeguard her own Private Information within her control. Plaintiff is a cautious person and is therefore very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

103. Plaintiff Zellers would not have entrusted her information with Defendant if she knew of Defendant's deficient data security practices. Plaintiff Zellers only allowed Defendant to maintain, store, and use her Private Information because she reasonably expected that Defendant would use basic security measures to protect the information entrusted to it and prevent its access by unauthorized third parties.

104. The Data Breach caused Plaintiff Zellers immediate injury due to the loss of privacy the moment her Private Information was viewed, accessed, and exfiltrated without her consent or authorization.

105. The Data Breach has caused Plaintiff Zellers to suffer anxiety and stress from concerns of her Private Information, including messages, being accessed, viewed and exfiltrated

and because she now faces an increased risk of financial fraud, identity theft and other types of monetary harm as a result of her Private Information being stolen.

106. The Data Breach has caused Plaintiff Zellers to suffer anxiety, stress, and emotional distress arising from the loss of control over her Private Information and the ongoing risk of misuse.

107. As a result of the disclosure of Private Information to unauthorized individuals due to the Data Breach, Plaintiff Zellers has suffered an invasion of privacy.

108. Plaintiff Zellers has suffered actual damages as a result of the failures of Defendant to adequately protect the Private Information entrusted to it, including, without limitation, lost time related to monitoring her accounts for fraudulent activity, exposure to increased and imminent risk of fraud and identity theft, actual fraud and identity theft, the loss in value of her Private Information, and other economic and non-economic harm. Plaintiff Zellers will now be forced to expend more time on an ongoing basis to review her credit reports and monitor her accounts for fraud and identity theft.

109. As a result of the Data Breach, Plaintiff Zellers has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. As alleged above, Plaintiff continues to suffer from anxiety and fear of a financial fraud and identity theft.

110. Plaintiff Zellers has also suffered a “loss of value” in her Sensitive Private Information when it was stolen by hackers in the Data Breach. A robust market exists for stolen Private Information. Hackers sell Private Information on the Dark Web—an underground market

for illicit activity, including the purchase of hacked Private Information—at specific identifiable prices. This market serves as a means to determine the loss of value to Plaintiff Zellers.

111. Despite taking precautionary measures and staying vigilant, Plaintiff Zellers has already experienced the effects of the theft of her Private Information and dissemination of her Private Information because Plaintiff Zellers has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

112. Plaintiff Zellers has been further injured by the damages to and loss in value of her Sensitive Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff Zellers was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

113. Plaintiff Zellers has a continuing interest in ensuring that her Private Information, which remains in Defendant's possession, is protected, and safeguarded from future breaches.

## VI. CLASS ACTION ALLEGATIONS

114. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

### A. Class Definitions

115. Plaintiff seeks to represent the following Class:

> Nationwide Class: All persons residing in the United States whose Private Information was impacted by Defendant's Data Breach (the "Class").

116. Excluded from the Class are Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, employees, legal representatives, successors, and assigns; and the judicial officer assigned to this case and members of the judicial officer's immediate family.

117. Plaintiff reserves the right to amend or modify the Class definition as discovery and further investigation reveal additional facts.

**B. Numerosity**

118. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Data Breach compromised the Private Information of millions of individuals.

**C. Commonality**

119. Questions of law and fact are common to the Class and predominate over questions affecting only individual members. Common questions include, but are not limited to:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' sensitive Private Information;

c. Whether Defendant had duties not to disclose the sensitive Private Information of Plaintiff and Class Members to unauthorized third parties;

d. Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' sensitive Private Information;

e. Whether Defendant failed to adequately safeguard the sensitive Private Information of Plaintiff and Class Members;

f. Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' sensitive Private Information;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant failed to timely detect, contain, and investigate the Data Breach;

i. Whether Defendant failed to timely and adequately notify Plaintiff and Class Members of the Data Breach;

j. Whether Defendant's acts and omissions caused Plaintiff's and Class Members' injuries;

k. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of the Data Breach and Defendant's wrongful conduct; and

l. Whether Plaintiff and Class Members are entitled to injunctive or equitable relief to, *inter alia*, redress the imminent and currently ongoing harm faced as a result of the Data Breach.

**D. Typicality**

120. Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class Members were subjected to the same Data Breach, had their sensitive Private Information compromised as a result of Defendant's uniform conduct, suffered similar injuries arising from Defendant's failures, and Plaintiff's and Class Members' claims are premised on the same legal theories.

**E. Adequacy**

121. Plaintiff will fairly and adequately protect the interests of the Class, because Plaintiff's interests are not antagonistic to those of the Class that Plaintiff seeks to represent, and Plaintiff is committed to vigorously prosecuting this action.

122. Plaintiff has retained counsel that are competent and experienced in complex class action litigation, data breach cases, and consumer and privacy protection matters, have adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed, and are committed to adequately representing the interests of the Class.

**F. Predominance and Superiority—Rule 23(b)(3)**

123. Common questions of law and fact predominate over any questions affecting only individual members of the Class. Defendant engaged in a common course of conduct that gives rise to Plaintiff's and Class Members' claims, and this litigation will turn on similar or identical violations, business practices, and injuries. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendant breached its duties and failed to protect Plaintiff's and Class Members' PII from theft and misuse, then Plaintiff and each Class Member suffered damages by that conduct.

124. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation or joinder of all Class Members would be impracticable and inefficient given the number of affected individuals and the common factual and legal issues presented. The proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies

of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

### G. Injunctive and Declaratory Relief—Rule 23(b)(2)

125. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

126. As demonstrated by the Data Breach, Defendant has failed to implement and maintain reasonable administrative, technical, and physical safeguards to protect Plaintiff's and Class Members' sensitive Private Information and has demonstrated an inability or unwillingness to do so absent judicial intervention.

127. Plaintiff and Class Members therefore remain at a continuing and imminent risk of harm because their sensitive Private Information remains in Defendant's possession, custody, or control, and Defendant's systems have already been shown to be vulnerable to compromise.

128. Plaintiff therefore seeks injunctive relief requiring Defendant to implement reasonable and appropriate data security measures, improve breach detection and response protocols, limit the collection and retention of sensitive Private Information to that which is reasonably necessary for legitimate business purposes and delete all data that is no longer reasonably necessary for Defendant to have in its possession, custody and control, provide appropriate data security training for employees, undergo periodic third-party security assessments, and comply with applicable data protection and notification obligations to prevent Plaintiff's significant, imminent, and ongoing risk of future harm.

## VII. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class)

129. Plaintiff restates and realleges the allegations contained in paragraphs 1 – 128 as if fully set forth herein.

130. Defendant owed Plaintiff and Class Members a duty to exercise reasonable care in collecting, storing, maintaining, and safeguarding their Private Information to prevent that information from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

131. Defendant's duty arose from Defendant's affirmative collection of Plaintiff's and Class Members' Private Information, exclusive possession and control of that information, the foreseeability of harm from unauthorized access, Defendant's representations and practices regarding data security, and Defendant's obligations under applicable laws, regulations, and industry standards.

132. Defendant has full knowledge of the sensitivity and value of the Private Information that it collected from Plaintiff and Class Members, and the type of harm that Plaintiff and Class Members would suffer if their Private Information was stolen and/or wrongfully disclosed.

133. Defendant's duty to use reasonable care arose from several other sources, including but not limited to those alleged herein.

134. Defendant further had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. Defendant knew that it was collecting and maintaining highly sensitive Private Information, that its computing systems and data storage architecture were vulnerable to unauthorized access, and that Defendant's systems would be targeted hackers for the purpose of stealing and misusing the troves of highly valuable sensitive Private Information that it collected, stored, and retained.

135. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

136. Additionally, Defendant assumed a duty to Plaintiff and the Class to protect their sensitive Private Information. Defendant represented to Plaintiff and the Class that it would implement measures to reasonably safeguard the information it collected and stored and kept in its possession. As such, when individuals and entities provided Defendant with Plaintiff's and the Class's sensitive Private Information and Defendant accepted and stored that data (for their own purposes and to their own financial benefit), Defendant assumed a duty to protect that Personal Information.

137. Defendant also had a duty to safeguard the sensitive Private Information of Plaintiff and Class Members and to promptly notify them of a breach under various state laws and statutes that require Defendant to reasonably safeguard sensitive Private Information, as detailed herein.

138. Defendant's duty to exercise reasonable care regarding Plaintiff's and Class Member's sensitive Private Information included, among other things: (a) designing, maintaining, and testing its security systems to ensure that Plaintiff's and Class Members' personal information in Defendant's possession was adequately protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) properly training employees to prevent breaches of its systems; and (d) maintaining security measures consistent with industry standards, including regularly updating, patching, and evaluating security measures.

139. Defendant's duties extended to protecting Plaintiff and the class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the

actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

140. Defendant also had a duty to provide timely, adequate notification of a data breach so that, among other things, Plaintiff and Class Members could take appropriate measures to freeze or lock their credit profiles; avoid unauthorized charges on their credit or debit card accounts; monitor their account information and credit reports for fraudulent activity; contact their banks or other financial institutions that issue their credit or debit cards; obtain credit monitoring services; and take other steps to mitigate or ameliorate the damages caused by Defendant's misconduct. Defendant was the only entity that had sufficient knowledge to properly provide this notice.

141. Defendant breached the duties it owed to Plaintiff and Class Members alleged above and, thus, was negligent in failing to do so. Defendant breached these duties by, among other things: (a) implementing inadequate security systems, protocols and practices that were insufficient to protect the sensitive Private Information of Plaintiff and Class Members; (b) failing to adequately monitor its systems for suspicious activity; (c) failing to timely detect, investigate, and contain the Data Breach and other unauthorized activity on its system while it was ongoing; (d) implementing inadequate and unreasonable access controls, intrusion-detection, and data-protection measures; (e) implementing security systems that did not comply with industry standards; (f) failing to comply with regulations protecting the Sensitive Private Information at issue during the period of the Data Breach; (f) over-retaining sensitive Private Information for longer than reasonably necessary; and (g) inadequately disclosing the Data Breach to Plaintiff and Class Members in an unreasonably delayed manner.

142. Defendant's acts and omissions fell below the standard of care that an entity entrusted with sensitive Private Information would reasonably exercise under similar circumstances.

143. As a direct and proximate result of Defendant's negligence, unauthorized actors accessed and exfiltrated Plaintiff's and Class Members' sensitive Private Information, causing the injuries and damages alleged herein.

144. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their sensitive Private Information would not have been compromised.

145. Defendant's failure to take proper security measures to protect the sensitive Private Information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiff's and Class Members' sensitive Private Information. As the entity collecting and storing Plaintiff's and Class Members' sensitive Private Information, Defendant was in the best position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

146. Plaintiff and Class Members were foreseeable victims of Defendant's inadequate data security practices, and it was also foreseeable that Defendant's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff and Class Members as alleged in this Complaint.

147. Defendant's negligence was therefore a substantial factor in causing Plaintiff's and Class Members' injuries, and Plaintiff and Class Members' injuries are the direct and proximate result of Defendant's wrongful and negligent conduct.

148. Plaintiff's and Class Members' injuries include: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value

of their privacy and the confidentiality of the stolen sensitive Private Information and loss of control over their sensitive Private Information the moment their sensitive Private Information was viewed, accessed, and exfiltrated without their consent or authorization; (c) the illegal sale of the compromised sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

149. Plaintiff and Class Members seek all relief available under law, including compensatory and consequential damages, restitution, injunctive relief requiring Defendant to implement reasonable data security measures and compliance programs, and such other relief as the Court deems just and proper.

## COUNT II
## NEGLIGENCE *PER SE*
## (On Behalf of Plaintiff and the Nationwide Class)

150. Plaintiff reallege and incorporate by reference paragraphs 1 – 128, as if fully set forth herein.

151. Defendant owed a duty to Plaintiff and Class Members to keep their Sensitive Private Information secure, arising under FTC Act.

152. Specifically, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendant for failing to use reasonable measures to protect sensitive Private Information. Various FTC publications and orders further form the basis of Defendant's duty.

153. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect sensitive Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of sensitive Private Information it obtained and stored and the foreseeable consequences of a data breach involving the highly sensitive Private Information that Defendant collected, stored, and maintained, including the damages that would result to Plaintiff and Class Members.

154. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

155. Defendant's violations of Section 5 of the FTC Act constitute negligence *per se*.

156. Defendant violated its duties by, among other things, inadequate security systems, protocols and practices that were insufficient to protect the sensitive Private Information of Plaintiff and Class Members, and by failing to timely and adequately notify Plaintiff and Class Members of the Data Breach.

157. Defendant's violations constitute negligence *per se* because Defendant violated laws designed to protect a specific class of persons—Plaintiff and Class Members—from a particular type of harm that Defendant's conduct caused.

158. Plaintiff and Class Members suffered injuries of the type the statutes were intended to prevent, including: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their sensitive Private Information the moment their sensitive Private Information was viewed, accessed, and exfiltrated without their consent or authorization; (c) the illegal sale of the compromised sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

159. Defendant's violations of these statutes were a direct and proximate cause of Plaintiff's and Class Members' injuries and damages.

160. As a result of Defendant's negligence per se, Plaintiff and Class Members are entitled to all relief available under law, including compensatory and consequential damages, statutory damages where available, injunctive relief, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, respectfully request that the Court enter judgment in their favor and against Defendant, and grant the following relief:

A. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiff as Class Representatives, and appoint Plaintiff's counsel as Class Counsel;

B. Declare that Defendant breached its duties to Plaintiff and Class Members, and that Defendant's acts and omissions described herein violate Plaintiff's and Class Members' legal rights;

C. Grant injunctive relief to prohibit Defendant from unlawfully retaining Plaintiff's and the Class's sensitive Private Information and continuing to engage in the unlawful acts, omissions, and practices described herein, and requiring Defendant to implement improved security procedures and measures, including, *inter alia*:

1. Requiring Defendant to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' sensitive Private Information;

2. Requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

3. Requiring Defendant to adequately train employees on phishing attacks, social engineering attacks, and ransomware attacks;

4. Requiring Defendant to implement procedures to mitigate the risk of social engineering and ransomware attacks, including implementing

advanced email security platforms with phishing detection, conducting real-time URL and attachment scanning, implementing Zero Trust network architecture, and implementing endpoint detection and response (EDR) systems;

5. Requiring Defendant to routinely and continually conduct internal training and education, at least annually, to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

6. Requiring Defendant to implement a system to assess their respective individuals' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing individuals' compliance with Defendant's policies, programs and systems for protecting sensitive Private Information;

7. Requiring Defendant to implement, maintain, regularly review and revise as necessary, a threat management program designed to appropriately monitor information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

D. Award Plaintiff and Class Members actual damages, compensatory damages, and nominal damages, as allowable by law and in an amount to be determined;

E. Order Defendant to provide appropriate notice, remediation, and ongoing protective services reasonably necessary to mitigate future harm to Plaintiff and Class Members whose sensitive Private Information was compromised;

F. Award Plaintiff and Class Members their reasonable attorneys' fees, costs, and expenses incurred in this action, as permitted by law.

G. Award pre-judgment and post-judgment interest as allowed by law;

H. Enter all other Orders, findings, and determinations identified and sought in this Complaint; and

I. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: May 21, 2026

/s/ Brent O. Hatch
**HATCH LAW GROUP, PC**
Brent O. Hatch
Adam M. Pace

**GIBSON CONSUMER LAW GROUP, LLC**
Marybeth V. Gibson

*Counsel for Plaintiff and the Proposed Class*